849 F.2d 820
 128 L.R.R.M. (BNA) 2766, 109 Lab.Cas. P 10,558
 LEHIGH PORTLAND CEMENT COMPANY, Appellant,
v.
CEMENT, LIME, GYPSUM, AND ALLIED WORKERS DIVISION,
INTERNATIONAL BROTHERHOOD OF BOILERMAKERS,
BLACKSMITHS, IRON SHIP BUILDERS, FORGERS
AND HELPERS, Appellee.
 No. 87-1464.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 8, 1988.
Decided June 16, 1988.
Rehearing and Rehearing In Banc Denied July 13, 1988.
 
 Alan R. Kaye, Charles J. Bloom (argued), Paul R. Lewis, Kleinbard, Bell & Brecker, Philadelphia, Pa., for appellant.
 Bruce E. Endy (argued), Spear, Wilderman, Sigmond, Borish, Endy & Silverstein, Philadelphia, Pa., for appellee.
 Before SEITZ, HUTCHINSON and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 Lehigh Portland Cement Company ("Lehigh") appeals from the district court's order entered July 14, 1987 which granted the motion of the Cement, Lime, Gypsum, and Allied Workers Division of the International Brotherhood of Boilermakers, Blacksmiths, Iron Ship Builders, Forgers and Helpers, ("the Union"), dismissing Lehigh's complaint. Because we agree with Lehigh that the district court erred in concluding that Lehigh's claim against the Union was arbitrable, we will vacate the judgment of the district court and remand for further proceedings.
 
 I.
 
 2
 This dispute centers on a Collective Bargaining Agreement entered into by Lehigh and the Union, dated May 1, 1981, which expired April 30, 1984. The Agreement provided, among other things, that the parties could not terminate it (and thus engage in a strike or a lockout) without providing notice to the other party. Lehigh charges that the Union did not provide the required notices under the Agreement and thus violated the agreement by striking. Lehigh brought the instant action in the United States District Court, for the Eastern District of Pennsylvania, seeking damages for the Union's breach of contract. The Union, contending that the dispute was arbitrable, moved to dismiss Lehigh's complaint.
 
 
 3
 Initially, the district court granted the Union's motion to dismiss, holding that the Collective Bargaining Agreement required that Lehigh submit the dispute to an arbitrator. Upon Lehigh's motion for reconsideration, the district court vacated the original judgment of dismissal and held an evidentiary hearing to receive evidence concerning the parties' bargaining history and their negotiations. After this hearing, the district court again ruled in the Union's favor and again dismissed Lehigh's complaint on the grounds that an arbitrator, and not the district court, was required to resolve Lehigh's claim. Lehigh appeals from the district court's order of July 14, 1987. Our review is plenary. We reverse.
 
 II.
 
 4
 In a labor dispute, "arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Thus, the issue of arbitrability is "a matter to be determined by the courts on the basis of the contract entered into by the parties." Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962). In interpreting a labor contract, the Supreme Court has instructed the federal courts to resolve ambiguities in favor of arbitration. The Court has established a "strong presumption" in favor of arbitrability. Nolde Brothers, Inc. v. Local 358, Bakery and Confectionery Workers, 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977).
 
 
 5
 However, despite this strong presumption, the touchstone of this type of analysis is still the language of the contract itself. "Absent a contractual obligation to the contrary, a reluctant party [to arbitrate] is free to pursue any available legal remedy to redress its grievances." Boeing Co. v. Auto Workers, 370 F.2d 969, 970 (3d Cir.1967). A recurring issue in this type of case is whether the company is required to bring its claims to an arbitrator when the collective bargaining agreement establishes procedures which limit the initiation of arbitration solely to the union.
 
 
 6
 In those cases where some ambiguous language appears in the contract and the contract can be read to provide for the employer initiating arbitration, this court has held that the strong presumption in favor of arbitration requires that the employer must arbitrate his grievance. For example, in Eberle Tanning Co. v. Section 63L, FLM Joint Board, Allegheny Division, United Food and Commercial Workers International Union, 682 F.2d 430 (3d Cir.1982), we held that the district court properly dismissed Eberle's breach of contract action because the dispute, under the parties' agreement, was to be decided by an arbitrator. While the first steps of the grievance procedures set forth in the agreement between Eberle and the union were designed to be employee initiated, later steps of the process called for both Eberle and the union to meet monthly to resolve grievances. Significantly, it provided, in addition, that "should the grievance remain unsettled, either party may refer it to a three (3) man Board of Arbitration." Id. at 432 (emphasis added).[1] We held that this quoted language created "an ambiguity concerning the Company's duty to arbitrate its grievances, an ambiguity which we must resolve consistent with federal labor policy." Id. at 434. See also Wilkes-Barre Publishing Co. v. Newspaper Guild, 647 F.2d 372 (3d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982).
 
 
 7
 However, when a contract contains no language which explicitly contemplates or permits the employer to initiate arbitration procedures, and the grievance structure is designed solely to afford the union the right to arbitrate, we have held that an employer, despite the presence of arbitration procedures in the collective bargaining agreement, is not bound to assert its claims before an arbitrator. Rather, we have permitted the employer to bring its claim against the union in the district court. Affiliated Food Distributors, Inc. v. Local 229, International Brotherhood of Teamsters, 483 F.2d 418 (3d Cir.1973); Boeing, 370 F.2d at 971. Accord Eberle Tanning, 682 F.2d at 435 n. 5 (distinguishing the procedures in Eberle's agreement from employee-oriented grievance procedures such as those found in Affiliated ).
 
 
 8
 Other Courts of Appeals faced with grievance procedures, which they construed as being wholly employee-oriented, have followed the principles announced in Boeing and Affiliated, and in each instance, have allowed employers to maintain actions against unions in federal district court rather than remitting their disputes to arbitration. Rochdale Village, Inc. v. Public Service Employees Union, 605 F.2d 1290, 1295-96 (2d Cir.1979); Faultless Division v. Local Lodge No. 2040 of District 153, International Association of Machinists and Aerospace Workers, 513 F.2d 987, 990 (7th Cir.1975); Friedrich v. Local No. 780, International Union of Electrical, Radio and Machine Workers, 515 F.2d 225, 228 (5th Cir.1975); Firestone Tire & Rubber Co. v. Rubber Workers Union, 476 F.2d 603, 675-76 (5th Cir.1973); G.T. Schjeldahl Co. v. Machinest Local 1680, 393 F.2d 502 (1st Cir.1968). As we demonstrate in the text following, even though each agreement must be analyzed independently, the grievance procedure and the other collective bargaining provisions found in the cases cited above are virtually indistinguishable from the provisions in the Agreement at issue here.
 
 III.
 A.
 
 9
 In Boeing, as in the instant case, the employer brought an action for damages in district court alleging that the defendant violated the no-strike clause of the parties' collective bargaining agreement. The union claimed that the controversy should be decided by an arbitrator rather than by a district court judge.
 
 
 10
 In affirming the district court's order, which denied the union's motion for stay pending arbitration, we recognized that the only issue for decision was whether arbitration should be ordered. After reviewing the various provisions of the Boeing agreement, (provisions which in substance are virtually identical to the provisions of the instant Lehigh agreement), we concluded that the grievance procedure was wholly employee-oriented. We held that the grievance procedure in Boeing was designed to resolve only the employees' grievances and as such, was available only to the employees as their exclusive remedy for the disposition of any claim of any kind that they had against their employer. Boeing, 370 F.2d 969 at 971.
 
 
 11
 Similarly, in Affiliated Food, the district court ordered a stay of the breach of contract suit brought by Affiliated against Local 229. On appeal to this court, we held that the collective bargaining agreement between Affiliated and Local 229 did not provide for the arbitration of employer complaints. Id. at 420. We noted that each of the procedural steps for bringing a case to arbitration placed the initiative on the union. The first step of the Affiliated grievance procedure provided that any grievance "may be taken up by the Union Steward(s)...." Id. at 421. At the second step, "the Business Representative of the Union shall take the subject matter up with the Employer." Id. If a mutually satisfactory result could not then be reached, the grievance was then referred to arbitration. Id. at 419. The Affiliated Food court in vacating the stay imposed by the district court and remanding for trial, explained:
 
 
 12
 When a contract ... is susceptible of a construction that dictates arbitration, the congressional policy favoring that form of dispute resolution may require the denial of judicial relief despite the possibility of fairly reading the contract to evidence a contrary intent. But, there is no occasion to resort to this congressional policy in a case where the contract, fairly read as a whole, is not susceptible of a construction that the parties bound themselves to arbitrate the dispute before the court. We conclude that this is such a case.
 
 
 13
 Id. at 420.
 
 
 14
 As the Affiliated court observed, "[a]t the heart of this matter, therefore, is the intention of the parties when they negotiated and signed their collective bargaining agreement." Id. at 419. Just as the Boeing and Affiliated courts looked to the parties' choice of words, terms, and procedures to evaluate their respective agreements regarding arbitration, so too, do we.
 
 B.
 
 15
 Article IX of the Agreement between Lehigh and the Union sets forth the grievance procedures. It states:
 
 Article IX
 Grievance Procedure
 Section I
 
 16
 Employees shall at all times make an effort to perform their duties in such manner as to promote the efficient operation of their department and the plant as a whole. The Company, in order to foster harmonious relations with employees, will administer all steps of their grievance procedure as soon as is practicable and will treat the grievant in an equitable manner. When an employee has a grievance, he shall proceed as follows:
 
 Step (1)
 
 17
 The employee himself, or with his committeeman, if he so desires, shall first make an effort to arrive at a satisfactory settlement with his foreman....
 
 Step (2)
 
 18
 If the grievance is not settled by means of Step (1) the grievance shall be reduced to writing, signed by the grievant, and presented to the Plant Manager. Where the Local Union submits a grievance, it shall be signed by an officer of the Local Union. A grievance must be submitted to this Step within thirty (30) days after the Local Union or the grievant first becomes aware of the reason for the grievance; otherwise, the grievance shall not be considered under this Article.... If the grievance is not settled or the Plant Manager does not give his answer within fourteen (14) days following the meeting, the grievance may be submitted to Step (3).
 
 Step (3)
 
 19
 If the grievance is not settled as provided in Step (2), the grievance shall be referred in writing to the Manager of Labor Relations within thirty-five (35) days following the date of the meeting as referred to in Step (2) otherwise the grievance will be given no further consideration under this Article....
 
 Step (4)(a)
 
 20
 The parties agree [that]....
 
 
 21
 A panel consisting of five (5) employee representatives to be selected by the Union and the Union coordinators will meet with the Company representatives semiannually to resolve grievances and discuss problems of mutual interest. The Union representatives will have full authority to resolve grievances and will fully exercise this authority. Discharge cases may be processed to this panel or directly to arbitration as solely determined by the Union.
 
 Step (4)(b) [omitted][2]
 Section 2
 
 22
 If an Agreement cannot be reached in the manner set forth above on grievances arising out of the interpretation, application or alleged violation of the Agreement, the matter may be submitted to arbitration in the following manner:
 
 Step (1)
 
 23
 Within thirty (30) days from the date the Union received the Company's reply to the grievance as provided in Step (3) of Section "1", the Union shall notify the Manager of Labor Relations in writing of its intent to arbitrate the grievance by naming its arbitrator. If such notice is not served by the Union within such thirty (30) days, the matter shall be given no further consideration under this Article.
 
 Step (2)
 
 24
 Within fourteen (14) days from date of notification of Union's intent to arbitrate, the Company shall notify the Union in writing of its designated arbitrator.
 
 
 25
 [Steps (3) and (4) omitted]
 
 
 26
 [Section 3 omitted]
 
 
 27
 Section 4.
 
 
 28
 Sufficient method of procedure having been established in this article to settle in an amicable manner any complaint or dispute that may arise, there shall be no strike by the employees of the Company nor any lockout of this Agreement.
 
 
 29
 Section 5.
 
 
 30
 Nothing in this Agreement shall be construed as obligating the parties to arbitrate any contract renegotiations.
 
 
 31
 J.A. at 169-171.
 
 
 32
 Our examination of the language quoted above reveals that the entire grievance and arbitration procedure set forth in Article IX, is designed to resolve only the employee's grievances. Under these provisions, arbitration cannot be initiated by, and is not available to, Lehigh, the employer.
 
 
 33
 The introductory language of Section 1 (Article IX) of the Agreement explicitly identifies the grievance procedure as belonging to the employees. It states: "When an employee has a grievance, he shall proceed as follows." A number of steps are then set forth: all are employee-oriented. Step 1 requires that the "employee himself, or with his committeeman, ... first make an effort to arrive at a satisfactory settlement with his foreman." Step 2 contemplates further actions taken by the Union or the employee, but does not authorize Lehigh to initiate any grievance process leading to arbitration. Each subsequent step in the grievance procedure is contingent upon the preceding steps, each of which requires that the grievance be prosecuted by an employee.
 
 Section 2 (Article IX) then states:
 
 34
 "If an Agreement cannot be reached in the manner set forth above on grievances arising out of the interpretation, application or alleged violation of the Agreement, the matter may be submitted to arbitration in the following manner:"
 
 
 35
 J.A. at 170 (emphasis added). The language "in the manner set forth above" necessarily refers to Section 1 procedures which, as we have shown, are structured solely for employee use. Thus, each subsequent step of Section 2 (steps (1) through (4)) leading to arbitration, is contingent upon agreement not having been reached under Section 1 of the Agreement. Thus, the entire grievance-arbitration procedure starts and ends only with employees. By doing so, it precludes the arbitration of any claim asserted by Lehigh.
 
 
 36
 The Union, to support its argument that Lehigh must arbitrate, largely ignores the initiating provisions of the grievance procedure, and instead, focuses upon Article IX's "no strike-no lockout" provision (Section 4) and the contract renegotiation provision (Section 5). Neither section bears upon the answer to the question: must Lehigh arbitrate? And, neither section can be said to have authorized Lehigh to initiate a grievance/arbitration procedure.
 
 
 37
 When read in context, it is evident to us that Section 4 does no more than require the Union not to strike and Lehigh not to "lockout." Thus, Section 4, rather than provide who may or who may not arbitrate, is a section devoted to economic coercion. The fact that Section 4 refers "to settl[ing] in an amicable manner any complaint or dispute that may arise...." (J.A. at 171) cannot be read as an authorization for employer initiated arbitration since its reference to any "complaint or dispute" is necessarily restricted to those "complaints" or "disputes" specified earlier in the Article IX "Grievance Procedure." As we have demonstrated, however, Article IX procedures are all employee-oriented, in that Article IX is available only to employees and their Union as their exclusive remedy for claims against Lehigh.
 
 
 38
 Nor can we read Article IX, Section 5 (no obligation on the parties to renegotiate contracts) as an override of the grievance procedure which, by its terms, excludes Lehigh as a grievant. First, as we have observed, the detailed provisions of Article IX, Sections 1 and 2, are wholly employee-oriented and do not provide for Lehigh to initiate arbitration.
 
 
 39
 Second, the "informal procedures" which the district court opined were available to Lehigh so that Lehigh could, in the district court's opinion, initiate grievance and arbitration procedures (J.A. at 220), find no expression in the parties' Agreement. We recognize that the Agreement specifies in Section 1, Step (4)(a), that the parties will meet semi-annually "to resolve grievances and discuss problems of mutual interest." J.A. at 170. The district court viewed this provision as affording Lehigh access to the grievance/arbitration procedure. But, even the district court expressed reservations about Lehigh's obligation to resort to arbitration under this provision of the Agreement.[3]
 
 
 40
 Moreover, that provision cannot be read as broadly as either the Union or the district court have read it. If Lehigh could only initiate a grievance at a semi-annual meeting, and if hypothetically a Union strike occurred one week after such a meeting had been concluded, it is evident that Lehigh would be obliged to wait almost six more months before it could file a grievance, which could ultimately lead to arbitration. We are not persuaded that the parties ever contemplated such an unworkable and bizarre result. Accordingly, we are satisfied that this provision cannot "carry the baggage" assigned to it by the Union.
 
 C.
 
 41
 As our analysis has revealed, our independent examination of the parties' Agreement fully supports Lehigh's contention that it is not susceptible to a construction binding Lehigh to arbitrate its damage claim against the Union. See Affiliated Food, 483 F.2d at 421. Moreover, even if we were not satisfied, as we are, that the Agreement, by its terms so provides, we have the benefit of an evidentiary record which bears out the conclusion we have reached.
 
 
 42
 Initially we observe that, in light of the plain meaning of the Agreement's provisions, no extrinsic evidence was required to resolve the issue in this case. Indeed it is apparent from our preceding discussion that we have decided that issue by reference only to the Agreement's express language. However, having evidence in the record to which we may look, reinforces our decision that Lehigh is not bound to arbitrate.
 
 
 43
 The most forceful evidence[4] supporting this conclusion is to be found in the exhibits which form the crux of the record. The 1959 Agreement (Exhibit 2) between Lehigh and the Union detailed a grievance procedure, and then provided:
 
 
 44
 If an agreement cannot be reached in the manner set forth above on grievances arising out of the interpretation, application or alleged violation of this agreement by the Union or by the Company the matter shall then be immediately referred to arbitration as set forth in the following manner:
 
 
 45
 J.A. at 99 (emphasis added).
 
 
 46
 The underscored language which Lehigh argues was "... the only language which suggested the possibility of employer grievances...." Brief of Appellant at 36, was deleted from the 1961 agreement (J.A. 105) and every subsequent agreement since. The 1961 agreement, which eliminated the words "by the Union or by the Company," reads:
 
 
 47
 If an agreement cannot be reached in the manner set forth above on grievances arising out of the interpretation, application or alleged violation of the agreement, the matter may be submitted to arbitration in the following manner....
 
 
 48
 J.A. at 105.
 
 
 49
 Although the Union argues that no significance should be given to the 1961 language deletion, the record discloses that in 1963 and again in 1964, the Union sought to modify the grievance procedure by proposing language expressly authorizing either party (i.e., the Union or Lehigh) to submit an unresolved grievance to arbitration. J.A. at 110, 129. In each instance, the Union proposed language reading:
 
 
 50
 If a meeting is held as in step 3 above, and the matter is not resolved, then either party may submit the issue or issues to arbitration by sending a letter requesting same to the Regional Office of the American Arbitration Association and the case or cases shall thereafter proceed under the Rules and Regulations of said Association. Either party shall be entitled to submit as many grievances at one time to a single arbitrator and single set of arbitration hearings as is practical and feasible.
 
 
 51
 J.A. at 110, 129 (emphasis added). In each instance, Lehigh rejected the proposal and the parties' Agreement remained in its present form.
 
 
 52
 While we find the record as to the Union's position with respect to this change to be somewhat confusing, we are satisfied that the bargaining history reflects the clear intention of the parties as it is expressed in the present Agreement--that Lehigh after 1961 was not required to arbitrate any claim that it had against the Union. Indeed, even if the Agreement at issue here was ambiguous on this point, which it is not, the bargaining history, in our view, meets the standard of "forceful evidence" announced in Warrior, 363 U.S. at 585, 80 S.Ct. at 1354.
 
 
 53
 Thus, like the Affiliated Food court, "we think it may be said with positive assurance ... that the arbitration clause of this collective bargaining agreement is not susceptible of a fair construction that the parties bound themselves to arbitrate employer grievances ..." Affiliated Food, 483 F.2d at 421.
 
 IV.
 
 54
 Despite the clarity of the Agreement's provisions and the significance of the bargaining history which we have recounted, the Union, nevertheless, contends that it should prevail because of this court's decisions in E.M. Diagnostic v. Local 169, 812 F.2d 91 (3d Cir.1987) and Controlled Sanitation Corp. v. District 128, International Association of Machinists, 524 F.2d 1324 (3d Cir.1975). We cannot agree.
 
 
 55
 In E.M. Diagnostic, the majority of the court identified the issue involved there as whether the subject matter of a Union grievance fell within the scope of the arbitration clause of a collective bargaining agreement. That is obviously not the issue here. Here, we are not concerned with whether a particular subject of an agreement, (i.e., subcontracting, pension contributions, plant closings, etc.) is subject to arbitration. Rather, we are concerned here with whether Lehigh, regardless of the disputed subject matter, must arbitrate any claim that it may have against the Union.
 
 
 56
 In Controlled Sanitation this court held that the company there had bound itself to arbitrate, even though the company argued that the grievance procedure was oriented solely to employee grievances. Our decision in Controlled Sanitation, however, affords little comfort to the Union here. The collective bargaining agreement in that case, specifically stated that the employer may be the grieving party, 524 F.2d at 1328, a provision significantly missing from the Agreement before us. Moreover, we stated in Controlled Sanitation that the agreement in that case was clearly distinguished from the agreement analyzed in Affiliated Food. Id. at 1329 n. 7. And, as we have earlier observed, Affiliated Food, which considered an agreement similar in substantive provisions to the Agreement at issue here, held that such an agreement was not susceptible of a construction binding the employer to arbitrate.
 
 V.
 
 57
 We will vacate the order of the district court, and remand for further proceedings upon reinstatement of Lehigh's complaint.
 
 
 
 [1]
 But see G.T. Schjeldahl Co. v. Machinest Local 1680, 393 F.2d 502 (1st Cir.1968) (similar provisions held not to trigger arbitration)
 
 
 [2]
 We have not reproduced those portions of Article IX which are not relevant to our discussion, and upon which neither party relies
 
 
 [3]
 The district court stated in its opinion: "That procedure, [forcing the Union to grieve], however, is not dispositive of the issue presently before the Court i.e., whether the company was obligated to resort to arbitration, before filing a court action, if faced with a Union violation of the Collective Bargaining Agreement" J.A. at 221
 
 
 [4]
 See United Steelworkers of America v. Warrior & Gulf Co., 363 U.S. 574, 585 (1960)